LOTTINGER, Judge.
This is a tort action arising out of an incident which occurred in the defendants’ jewelry store in Covington, Louisiana on October 1, 1963.
Mrs. Virginia T. Dykes, one of the plaintiffs herein, entered the defendants’ jewelry store to make a purchase and to pay an account which she owed there, and while there slipped and fell on the floor of the premises. Shortly after falling, she was taken by automobile to the office of her family physician. On September 28, 1964, Mrs. Dykes and her husband filed this tort action, naming as defendants the proprietors of Champagne’s Jewelry Store and their insurer, Insurance Company of North America. This action was based upon her allegation that her fall was caused by the proprietors of Champagne’s Jewelry Store having applied wax in such an excessive amount so as to render the floor of the premises extremely dangerous. She also contended in her petition that the defendants had failed to warn her of the slippery condition of the floor.
The defendants answered the suit, generally denying the plaintiffs’ allegations, and alternatively urging that the accident was caused solely by negligence of Mrs. Dykes, or again alternatively, that her negligence was at least a sufficient contributing cause to the accident in order to bar her recovery herein. After a trial on the merits, the Trial Judge rendered judgment in favor of Mrs. Dykes in the amount of $6,500.00 and in favor of Mr. Dykes in the amount of $2,133.21, together with the costs, expert witness fees and interest, casting in judgment all of the defendants. The Trial Judge did not furnish written reasons for judgment and defendants applied for and were granted a suspensive appeal to this Court. Appellees have not answered this appeal.
The premises of the defendants is approximately 22 feet in width and approximately 60 feet in length, with counters situated against each wall, thus forming a center aisle approximately 10 feet wide and 60 feet long. The floor of the store is compressed sawdust having a wood texture, and a section in the rear of the store is covered by a rug approximately 12 by 16 feet in diameter. Thus the size of that section of the floor of the premises which is covered by this compressed sawdust flooring is approximately 10 feet wide and 40 feet deep.
As aforesaid, on the day of the injury, the plaintiff had gone into the defendants’ store to make a purchase and to pay a bill. *923 She testified that she entered the front door, told a sales clerk that she wanted to see Mrs. Champagne, that Mrs. Champagne was pointed out to her about midway the, depth of the store on the left-hand side, and that she walked diagonally across the aisle and started her conversation with Mrs. Champagne. They conversed briefly, Mrs. Dykes told Mrs. Champagne she wanted to pay a bill, Mrs. Champagne said that she would have to look up the amount, and Mrs. Dykes asked if she could use the telephone while Mrs. Champagne was checking the amount of the bill. When she was told that she could use the telephone, she walked to its location in the left rear of the store, walking onto the carpeting as she approached the telephone. She completed her phone call, turned back to the front of the store and was walking toward the counter to look at some bracelets that she was interested in purchasing when she testified that her feet went out from under her and she fell on the lower part of her spine and flat of her back. At the time that she fell she had already traversed the carpeted rear portion of the store and was walking on the compressed sawdust floored section. Mrs. Dykes testified that as she fell, she threw her arms out to catch herself and did manage to keep her head from hitting. She also testified that right after she landed, she found that her hand was in “wet wax” and that after she had been in a sitting position for a few minutes, asked someone to hand her her purse so that she could get something out of it to wipe the wax off of her hands. She said that after she fell and was sitting on the floor looking toward the front of the building she saw Charles Champagne, a porter, and Mrs. Champagne. Her testimony is that no one had warned her at any time while she was in the store that the floor was being waxed or had just been waxed. She also said that she had not seen anyone waxing the floor but that after she had fallen and was still sitting facing the front of the store, she noticed the waxer sitting at the front of the store. Mrs. Dyke’s testimony is to the effect that she felt pain immediately, remained in a sitting position thinking that it might dissipate, an that after sitting a while longer the pain intensified and her legs seemed to be getting numb. Her family physician, Dr. Giles, was called and pursuant to his instructions a taxi was called and the driver of the taxi and Mr. Champagne lifted Mrs. Dykes into a straight-backed chair, put her into the taxi and drove her to Dr. Giles’s office, where they took her into the examining room. After a preliminary examination, Dr. Giles had her admitted to St. Tammany Hospital by ambulance. She remained hospitalized for three and a half weeks after which she was permitted to go home as a bed patient. After having been home for about five days, the pain in her back increased and Dr. Giles had her readmitted to the hospital where she remained for an additional three week period after which she was again discharged. At the time that she was in the hospital, Mrs. Dykes was in traction with weights and a pelvic support of heavy canvas and after she was finally discharged from the hospital she was placed on a fracture board on which, according to her testimony, she was still sleeping at the time of the trial. She testified that she was under quite heavy sedation during the entire period of her hospitalization and for a time thereafter when she was returned home. At the time of the trial, she was still occasionally taking medication for pain. Her testimony is that the injury limited her physical activity to the extent that she could not drive an automobile, was not able to lift anything and was very limited as to the type and amount of housework that she could do as of the time of the trial.
Mrs. Dykes testified that she required full time domestic help when she was first injured because of the fact that she and her husband have four young children and that her husband leaves for work at approximately seven in the morning and that he does not return until approximately seven in the evening. She stated that as of the date of the trial, she still had to obtain domestic
*924 help three or four times a week in order to do the heavy work and the ironing that she was unable to do.
The specifications of error alleged by appellants are:
1. That the Trial Court erred in concluding that the defendants were guilty of primary negligence.
2. That the Trial Court committed error in concluding that plaintiffs had met the burden of proving that the accident was caused by any negligence on the part of the defendants, and
3. That the Trial Court erred in failing to maintain defendants’ alternative defense of contributory negligence and assumption of risk.
With reference to the first specification of error we find that the following facts are amply substantiated by the record. Immediately prior to the time that Mrs. Dykes entered the defendants’ premises the janitor employed by the defendants had cleaned the floors, waxed them with paste wax, and buffed them. He testified that when Mrs. Dykes came in he had finished with the cleaning, waxing, and buffing procedure and was outside cleaning the windows. This occasion was the first occasion that this particular floor had ever been waxed because the floor had only very shortly before been installed. The record does not reflect that the defendants or any of their employees at any time warned Mrs. Dykes that the floor was freshly waxed and that it might be slippery. Mrs. Dykes testified positively to this lack of warning, and no evidence was introduced by the defendants except some medical evidence in the form of letters from a physician. There is some apparent conflict in the testimony of Mrs. Dykes to the effect that the wax was “wet” and that of the janitor who testified that he had completely buffed the waxed area. However, we believe this conflict to be of little consequence, as it is immaterial whether the surface of the floor had been left wet with wax or buffed immediately prior to Mrs. Dykes’ entrance onto the premises. Either eventuality would have left the floor in a highly slippery and therefore hazardous condition, and we believe that the law is clear that a person who enters a store for the purpose of trade occupies the status of an invitee and that the owner or proprietor of a store must exercise ordinary care and prudence to keep the aisles, passageways, floors and walks in a reasonably safe condition for his customers. Provost v. Great Atlantic and Pacific Tea Co., La.App., 154 So.2d 597 (1963). Accordingly, we find that in this particular instance that the defendants were guilty of primary negligence in having that portion of the floor of their premises which was traversed by customers in a slippery and unsafe condition by reason of the application of wax and possible buffing thereof without having taken the precaution to inform invitees who could reasonably be expected to enter the premises of the condition of the floor. Accordingly, we find no merit in the appellants’ first specification of error.
We believe that the reasons set forth for rejection of the appellants’ first specification of error likewise apply to appellants’ second specification of error which is to the effect that the Trial Court committed error in concluding that the plaintiffs had met the burden of proving that the accident was caused by any negligence on defendants’ part. In substance, we believe these two specifications to be one and the same.
With reference to appellants’ third specification of error, to the effect that the Trial Court committed error in failing to maintain defendants’ alternative defense of contributory negligence and assumption of risk, we note the following facts from the record. Mrs. Dykes testified that when she first entered the store there was no waxing operation being conducted and that later as she walked to the rear of the store that she did not see any wet wax on the floor. She stated that she did not see the waxer when *925 she first walked in, nor did she see the porter. Her testimony is that she encountered no difficulty when she first walked to the mid portion of the store to talk with Mrs. Champagne nor did she encounter any difficulty walking from the point where she had been talking with Mrs. Champagne to the rear of the store to use the telephone. Her testimony is that when she finished using the telephone and started to return to Mrs. Champagne, she did not travel the same path across the wooden section of the floor that she had traveled in reaching the telephone. She had only taken three or four steps from where the carpeting ended and the wooden floor began before she fell. As stated before, it was only after she fell in a sitting position and was facing the front of the store did she notice the waxer sitting at the front of the store. As a matter of corroboration, the slacks which Mrs. Dykes wore on the day of the accident were, according to her testimony, preserved in the identical condition as they were immediately after the accident, and this item of clothing was introduced to evidence by appellees. We note that there is on the rear of these slacks, on that portion thereof which would have come into contact with the floor if Mrs. Dykes fell as she described, streaks of some extraneous substance which could in fact be wax. Mrs. Dykes testified that at the time that she fell she had not only gotten wax on her hands but she got some of the wax on her slacks at the point where she came into contact with the floor.
One of the witnesses for the plaintiffs was the taxi driver who took Mrs. Dykes to the physician’s office. When questioned about the condition of the floor he replied that it looked like it had been recently waxed because it had a shine to it. He also testified that when he first walked into the store, somebody cautioned him to watch his step.
Thus, the facts are that Mrs. Dykes entered this store intent upon examining the merchandise which was displayed there and paying a bill, and that upon entering saw nothing which would indicate to a reasonably prudent person that any hazard existed. She saw no one applying wax to the floor, she saw no one polishing wax which had already been applied, and she saw no machine which could be used in the polishing of wax. No one informed her that the floor had been recently waxed, although she spoke with one of the sales clerks and Mrs. Champagne before walking to the back of the store to use the telephone. Our interpretation of the record is that there was nothing present in the store which could be expected to warn a reasonably prudent person of the fact that a hazardous condition existed. The existence of this condition was entirely within the knowledge of the defendants, there being no outward manifestation thereof. Under the circumstances, we do not believe that the appellee was guilty of any contributory negligence and therefore find no merit in appellants’ third specification of error.
With reference to the quantum of damages awarded by the Trial Court, we find that the record supports the sum of .$1114.21 in hospital expenses and the total sum of $395.00 in medical expenses expended by Mr. Dykes from community funds. The Trial Court awarded a total of $2133.21 in special damages, and since the Trial Judge did not favor us with written reasons for judgment we must make the assumption that the difference between the combined total of hospital and medical expenses and the total award of special damages represents the Trial Court’s award to Mr. Dykes to compensate him for domestic help which was necessitated by Mrs. Dykes’s incapacity. The record indicates that after Mrs. Dykes was finally discharged from the hospital, she was unable to do any household work for approximately a year, and that as of the date of the trial, she was only able to do light housework. In their petition, which was filed September 28, 1964, the plaintiffs prayed for special damages in the amount of $680.00 nor extra household help to the date of the filing of the petition. Mrs. Dykes *926 testified that prior to the accident she had employed domestic help for two and sometimes three days per week, whereas after the accident, she employed this help for six days per week. Mrs. Dykes testified to and produced cancelled checks evidencing an approximate expenditure of $1585.00 for domestic help between October 1, 1963 and December 31, 1964. In substance, we believe that there is ample evidence and testimony in the record to substantiate the apparent award by the Trial Judge to the plaintiffs of the sum of $624.00 for domestic services.
With reference to the quantum of damages awarded by the Trial Court to Mrs. Dykes, we note that she was hospitalized initially for a period of three and one-half weeks, and then went home and remained in bed for about five days, and was subsequently readmitted to the hospital for an additional three week period. During the entire time that she was hospitalized she was kept in traction and was, after her final release from the hospital, unable to perform any housework at all for a period of about a year. As of the date of the trial, March 9, 1966, she was still unable to drive an automobile, do any lifting, or any heavy housework. She testified that her back injury still bothered her quite frequently and that as of the date of the trial it was still necessary that she take sedation when her back began to ache.
Dr. Diamond, one of the doctors who treated Mrs. Dykes, and who was accepted by the Court as an expert orthopedist, testified that in his opinion she had sustained a compression fracture of either the lower part of the third or the upper part of the fourth sacral segment. Dr. Diamond testified that when he examined Mrs. Dykes she was complaining of excruciating pain in the sacral and coccygeal areas of the lower back. He found extreme tenderness in that area, and extensive muscle spasm. Dr. Diamond testified that the fracture in itself would not normally have been any great problem and would have healed after a period of pain with simple rest and without too much difficulty. However, Mrs. Dykes’s condition was complicated by the fact that this injury reactivated an old coccygeal pain that Mrs. Dykes had had for about five years as a result of a fractured coccyx which she had sustained some five years previously. Our interpretation of Dr. Diamond’s testimony is that this particular accident aggravated the old injury which Mrs. Dykes had sustained.
Dr. Giles, Mrs. Dykes’s family physician, testified that he was a general practitioner and was accepted by the Court as an expert in that capacity. He testified with reference to the various injections given Mrs. Dykes for pain on the day of the accident and thereafter. He also testified about the ulcerated colitis which Mrs. Dykes developed in the interval between being discharged from the hospital after her first stay and her readmission. Dr. Giles stated that ulcerative colitis such as Mrs. Dykes had is a nervous disease which is usually caused by some trauma. Under cross examination, in testifying about the connection between an ulcerative colitis and the accident, Dr. Giles stated that he had treated Mrs. Dykes for ten years, had known her for a long time, and knew that Mrs. Dykes had never had this particular ailment before and that it was for this reason that he connected the colitis with the injury. This injury, according to Mrs. Dykes’s testimony, produced hemorrhaging for a period of time during her second stay in the hospital. Dr. Giles also testified that in his opinion, Mrs. Dykes had sustained a fracture of the fourth sacral segment.
There are in the record two medical reports from Dr. Cahen, filed by appellants and which by stipulation with counsel for appellees constitute the testimony of Dr. Cahen. The substance of these reports is to the effect that he, who examined Mrs. Dykes on one occasion, and x-rays taken shortly after the date of the accident on another, was of the opinion that she had sustained an injury to the pelvic area and low back zone as a result of a fall on October 1, *927 1963. In his first report Dr. Cahen stated that he assumed that the trauma resulted in a fracture of the third sacral segment and also found in the course of his examination of Mrs. Dykes on February 10, 1965 that the fracture had healed.
Considering the injuries sustained by Mrs. Dykes, her period of hospitalization and subsequent recuperation and the disabilities still attendant to Mrs. Dykes at the time of the trial, we find that the
Trial Court did not abuse the much discretion vested in it in assessing damages. In the absence of an abuse of the “much discretion” vested in the Trial Court, we have no authority to change that Court’s award. Ballard, et ux. v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964) in the judgment of the Trial Court is therefore affirmed, appellants to pay all costs of this appeal.
Judgment affirmed.